UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ROBERT CHIOINI and THOMAS KLEMA,

     Plaintiffs,

 vs.

BENJAMIN WOLIN, MARK RAVICH, JOHN COOPER, ROBIN SMITH, LISA COLLERAN, and ROCKWELL MEDICAL, INC.

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. No.

**COMPLAINT FOR VIOLATIONS OF FEDERAL
WHISTLEBLOWER LAWS AND OTHER RELIEF**

**JURY DEMAND**

# TABLE OF CONTENTS

I.        INTRODUCTION ................................................................1

II.       PARTIES ..........................................................................7

III.      JURISDICTION AND VENUE.........................................8

IV.       FACTUAL ALLEGATIONS..............................................9

   A.    Rockwell Develops the Drug Triferic and Seeks Separate
         Reimbursement Approval from the Centers for Medicare and Medicaid
         Services. ......................................................................10

   B.    Richmond and Ravich Start Activist Campaign and Begin Scheme to
         Enrich Themselves and their Associates at Rockwell's Expense. ...................11

   C.    Defendants Conspire to Add Unqualified Director Candidates to
         Rockwell's Board to Further their Scheme to Enrich Themselves.................16

   D.    Richmond, Smith, Cooper, and Ravich Take Control of the Board by
         Causing Directors to be Chosen who were Secretly Loyal to the
         Scheme, Not the Company, Giving Defendants and Richmond
         Sufficient Control to Defraud Rockwell's Shareholders. ...............................22

   E.    Each Defendant Failed to Disclose Material Information About Past
         Allegations of Misconduct, Connections to the Richmond/Ravich
         Shareholder Group, and/or Violations of SEC Regulation FD.......................31

         1.   Material Misrepresentations of Own Qualifications Made by Smith. .................31

         2.   Material Misrepresentations of Own Qualifications Made by Cooper. ...............33

         3.   Material Misrepresentations Made by Ravich. ....................................34

         4.   Material Misrepresentations of Own Qualifications Made by Wolin.................35

         5.   Material Misrepresentations of Own Qualifications Made by Colleran. ............36

   F.    Chioini and Klema File the Whistleblower Complaint with the SEC. ...........36

   G.    The Company Receives the Shareholder Demand Letter ...............................38

   H.    Chioini's and Klema's Positions are Purportedly Terminated by
         Defendants in Contravention of their Employment Agreements, the
         Rockwell Bylaws, and Applicable Law..........................................................40

         1.   The Events of Monday, May 21, 2018. .........................................40

         2.   The Events of Tuesday, May 22, 2018. .........................................42

         3.   The Events of Wednesday, May 23, 2018. .......................................47

4. The Events of Thursday, May 24, 2018..................................................51

5. The Events of Friday, May 25, 2018. ..................................................57

FIRST CAUSE OF ACTION ...........................................................................59

SECOND CAUSE OF ACTION .......................................................................68

THIRD CAUSE OF ACTION ..........................................................................77

PRAYER FOR RELIEF ..................................................................................84

JURY DEMAND ..........................................................................................85

## I.    INTRODUCTION

1.    This lawsuit seeks redress against five members of the Board of Directors who hijacked control of a company to commit securities fraud and enrich themselves personally at their fiduciaries' expense, then retaliated against two executives who blew the whistle on their misconduct. Plaintiffs Robert Chioini ("Chioini") and Thomas Klema ("Klema," and collectively, "Plaintiffs") served, respectively, as the long-time Chief Executive Officer, President, founder, and Director of, and the Chief Financial Officer of, Rockwell Medical, Inc. ("Rockwell" or the "Company"). Rockwell is a pharmaceutical company that has long sought the development, production, marketing, and profitable distribution of a particular proprietary drug, Triferic. Defendants Benjamin Wolin ("Wolin"), Mark Ravich ("Ravich"), John Cooper ("Cooper"), Robin Smith ("Smith"), and Lisa Colleran ("Colleran," and collectively, the "Defendants" or "Conflicted Directors") are five of the eight members of Rockwell's Board of Directors. Over the past eighteen months, the five Defendants, in concert with David Richmond ("Richmond"), a registered investment advisor who, together with his approximately 600 clients, controls a large stake in Rockwell, have pursued a strategy designed to enrich themselves at the expense and detriment of Rockwell and its shareholders. Plaintiffs, together with non-party Directors Ronald Boyd

1

("Boyd") and Patrick Bagley ("Bagley"), have acted to protect Rockwell and its shareholders from Defendants' misconduct.

2.    In pursuit of personal enrichment at Rockwell's and its shareholders' expense, Defendants have acted and continue to act *ultra vires*, including actions which, among other things:

> a.  violated their fiduciary duties of loyalty and care to Rockwell, as well as federal anti-fraud securities laws and rules including, but not limited to, Section 10(b) of the Securities and Exchange Act of 1934 ("Exchange Act") and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5, by intentionally publishing or otherwise issuing materially false and misleading information, and failing to disclose material information which they were required to disclose;

> b.  violated their fiduciary duties of care and loyalty and Regulation Fair Disclosure ("Regulation FD") by selectively disclosing material nonpublic information ("MNPI") to particular shareholders with the purpose of enriching themselves and, upon information and belief, of engaging in a conspiracy to manipulate Rockwell's stock price and possibly commit, and/or aid and abet in committing, insider trading;

> c.  violated their fiduciary duties of loyalty and care to Rockwell by manipulating outside consultants into issuing an altered and materially

2

false report, then using that report as a rational to vote themselves excessive, unearned, and illegal compensation;

d.  refused to permit Rockwell's non-conflicted Directors, Bagley and Boyd, to obtain information they are entitled to as members of the Board and which is necessary to make decisions on behalf of Rockwell, and excluded the same from participation in significant discussions and decisions regarding Rockwell;

e.  violated their fiduciary duties of loyalty and care as well as the Company's ethics and conflict of interest policy, found in the Rockwell Principles of Corporate Governance, adopted and effective as of March 23, 2017, by failing to recuse themselves from matters in which they held conflicts of interest;

f.  failed to disclose to Rockwell and its shareholders all of their unlawful conduct and implicit waivers of the Rockwell Principles of Corporate Governance; and

g.  concealed and conspired to conceal the foregoing breaches of fiduciary duty, self-dealing, and other wrongful conduct by, *inter alia*, (i) immediately engaging in a series of retaliatory actions, including Plaintiffs' termination, upon learning that Plaintiffs had filed the Whistleblower Complaint with the SEC; (ii) holding secret board

meetings excluding Boyd, Bagley, and Chioini; (iii) disguising their true intentions from Rockwell, its non-conflicted directors, its management, and governmental authorities; (iv) issuing materially false and misleading Form 8-Ks and press releases; and (v) interfering with, and attempting to end, an independent investigation into their own wrongdoing being performed by an outside law firm, Dickinson Wright PLLC ("Dickinson Wright").

3.      Chioini and Klema were suspicious of the Defendants, and came into possession of evidence which tended to show that the Defendants were acting in concert with Richmond to enrich themselves, waste corporate assets, and defraud the Company and its shareholders at the expense of Rockwell, in part through the aforementioned breaches of securities laws, Company policies and procedures, and fiduciary duties. Plaintiffs reported these matters internally to certain Board members and outside legal counsel to Rockwell to no avail.

4.      Seeking to protect Rockwell and put an end to Defendants' unlawful and unethical conduct, on Thursday, May 17, 2018, Chioini and Klema filed, through counsel, a whistleblower complaint with the SEC (the "Whistleblower Complaint").

5.      On Monday, May 21, 2018, Chioini and Klema received a shareholder demand letter (the "Demand Letter"), and promptly informed Rockwell's outside

SEC counsel. The Demand Letter made serious allegations of wrongdoing against Richmond, and of wrongdoing and/or mismanagement against most of the Defendants to this suit. The Demand Letter served to further confirm Chioini's and Klema's suspicions that a majority of the Board was acting in concert with Richmond to fraudulently enrich themselves at the expense of Rockwell and its shareholders, in violation of federal securities laws, Michigan law, and their fiduciary duties. Plaintiffs promptly disclosed the Demand Letter to Rockwell's auditors and other counsel, who advised that it would be both customary and best practice for the two Directors not implicated by the allegations, Boyd and Bagley, to conduct and supervise an independent investigation.

6.     Upon information and belief, the very next day, the five Defendants met in secret and held a separate, secret conference call. Upon further information and belief, during these two discussions, from which two independent directors, Bagley and Boyd, were excluded, Defendants determined to terminate Chioini immediately and to terminate Klema soon thereafter, in retaliation for the Whistleblower Complaint and completely hijack the Board and the Company.

7.     Chioini and Klema also informed the Board on May 21 that they had received the Demand Letter. Pursuant to Rockwell's Bylaws (the "Bylaws"), Chioini called for an emergency meeting to be held that same evening of May 21 to discuss the Demand Letter. Plaintiffs also intended to notify the Board of the

Whistleblower Complaint. All eight Directors, including Chioini, accepted a calendar invitation to the Emergency Meeting, but shortly thereafter, several Defendants began attempting to delay the call, many doing so on the basis that there was no rush to meet. When the scheduled time came, all five Defendants, most without excuse or prior notice, failed to join the conference call; only Chioini, Klema, Boyd, Bagley, outside counsel, and the firm's general counsel attended. During this Meeting, Bagley and Boyd agreed to conduct and supervise the independent investigation, for which Dickinson Wright would be retained, into the Demand Letter's allegations of wrongdoing. At 5:45 PM on May 21, Klema called for a second Special Meeting of the Board to take place the next day, Tuesday, May 22, 2018, at 6:00 PM pursuant to the Bylaws. In that email, Klema disclosed to the Board that he and Chioini had filed the Whistleblower Complaint with the SEC for the first time.

8.     Barely twenty-four hours after that disclosure, the Conflicted Directors, without prior notice to or the consent of Bagley, Boyd, or Chioini, usurped the May 22, 2018 Special Meeting, purported to summarily fire Chioini, thereby violating Chioini's Employment Agreement and the company's Bylaws. The two non-conflicted directors, Bagley and Boyd, were not permitted to speak before the vote to fire Chioini was called, and one of the two non-conflicted directors was not permitted to cast a vote. Defendants then issued a materially false

6

and misleading press release and an 8-K, purportedly on behalf of the Board, but giving no prior notice of them to Boyd, Bagley, or Chioini, both of which falsely stated that Chioini had been terminated and had resigned from the Board. When Klema refused to abet Defendants' actions and instead followed the directives of the sole two non-conflicted Directors, he too was purportedly terminated by Defendants, again violating Klema's Employment Agreement and the Bylaws, again without the consent of or prior notice to Bagley or Boyd, and again followed by the issuance of a materially false and misleading 8-K.

9.      Plaintiffs now respectfully request that this Court find that Defendants violated, *inter alia*, 15 U.S.C. § 78u-6(h) ("Dodd-Frank Whistleblower Protection"), the Michigan Whistleblowers' Protection Act, and Michigan public policy, and grant Plaintiffs relief, including, but not limited to, damages, reinstatement in those positions they were purportedly terminated from in retaliation for filing the Whistleblower Complaint, attorney's fees, costs, and whatever other relief this Court finds is just and proper.

## II.    PARTIES

10.     Plaintiff Robert L. Chioini is a resident of Wixom, Michigan. Chioini is the founder of Rockwell and is, notwithstanding Defendants' illegal actions purporting to terminate his employment, Rockwell's President and Chief Executive Officer.

11.     Plaintiff Thomas Klema is a resident of Dearborn, Michigan. Klema is, notwithstanding Defendants' illegal actions taken purporting to terminate his employment, Rockwell's Chief Financial Officer.

12.     Defendant Benjamin Wolin is a resident of Brooklyn, New York. Wolin is a member of the Rockwell Board of Directors.

13.     Defendant Mark Ravich is a resident of St. Louis Park, Minnesota. Ravich is a member of the Rockwell Board of Directors.

14.     Defendant John G. Cooper is a resident of Doylestown, Pennsylvania. Cooper is a member of the Rockwell Board of Directors.

15.     Defendant Robin Smith is a resident of New York, New York. Smith is a member of the Rockwell Board of Directors.

16.     Defendant Lisa N. Colleran is a resident of Basking Ridge, New Jersey. Colleran is a member of the Rockwell Board of Directors.

17.     Defendant Rockwell Medical, Inc. is a Michigan corporation with its principal place of business in Wixom, Michigan.

## III.   JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367.

19.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial part of the events and omissions giving rise to the claims asserted herein occurred in this District.

20.     This Court has personal jurisdiction over each defendant who is a natural person as each purposefully availed itself of the privilege of exploiting forum-based business opportunities and did in fact transact business within this state and/or acts as a director of a corporation incorporated under the laws of and having its principal place of business within this state, and the exercise of personal jurisdiction is consistent with Mich. Compl. Laws § 600.705. This Court has general personal jurisdiction over Rockwell as it is incorporated under the laws of this state and carries on a continuous and systematic part of its general business within this state, and this exercise of personal jurisdiction is consistent with Mich. Compl. Laws § 600.711.

21.     The Employment Agreements entered into by Plaintiffs Chioini and Klema both contain arbitration provisions. However, Defendants waived any right to demand that the claims asserted herein be arbitrated by filing a preemptive suit in the Oakland County Circuit Court for the State of Michigan, Case No. 2018-165893-CB. *See, e.g.*, *Crossville Med. Oncology, P.C. v. Glenwood Sys., LLC*, 310 F. App'x 858, 859 (6th Cir. 2009).

## IV.   FACTUAL ALLEGATIONS

**A. Rockwell Develops the Drug Triferic and Seeks Separate Reimbursement Approval from the Centers for Medicare and Medicaid Services.**

22.     Chioini founded Rockwell in 1995. He has acted as the CEO of the company at all times since its founding. Rockwell underwent an Initial Public Offering in 1998. Today, upon information and belief, there are approximately 10,000 beneficial holders of Rockwell's common stock.

23.     Rockwell's principle product is a proprietary drug named Triferic. Triferic, an iron maintenance drug with unique therapeutic value, was approved by the U.S. Food and Drug Administration ("FDA") for commercial sales on January 24, 2015, and launched commercially in the United States on September 9, 2015. It has the potential to be an enormous revenue stream for Rockwell for many years into the future.

24.     Triferic is currently on the market. For the last two and one-half years, Rockwell has sought to obtain separate Medicare reimbursement for the drug from the Centers for Medicare and Medicaid Services ("CMS"), as opposed to it being sold in the "bundle payment." If Triferic is sold in the bundle payment, no money will be allocated for the drug's purchase, resulting in substantially lower profits for Rockwell from sales to Medicare service providers. In his role as CEO, one of Chioini's primary responsibilities has been to work with CMS and the United States Congress to obtain approval of the separate reimbursement for Triferic. This

pursuit was, upon information and belief, going well, and several leading Members of Congress have been actively working with the Company to obtain separate reimbursement for Triferic. Chioini was intricately engaged in pursuit of the separate reimbursement up to the time that he was purportedly terminated from his positions with Rockwell on May 22, 2018.

25.    In the time since Defendants purported to terminate Chioini and Klema, the Board has attempted, in violation of a state court order not to take certain material actions, to abandon the pursuit of separate reimbursement. Upon information and belief, this action was taken to put in motion a plan to benefit Defendants and Richmond at the expense of Rockwell and its shareholders, and has and will cause irreparable harm to Rockwell's shareholders.

**B. Richmond and Ravich Start Activist Campaign and Begin Scheme to Enrich Themselves and their Associates at Rockwell's Expense.**

26.    Richmond began accumulating shares in Rockwell in 2005, at a time when investment in the stock was a risky proposition due to the then still uncertain outcome of the FDA clinical trials for Triferic and the Company's lack of money to fund the trials. Apparently playing the long game to take control of Rockwell, and accumulating shares at his client's expense over several years, Richmond bypassed multiple opportunities to sell the shares he had accumulated. At any of these times, Richmond could have locked in gains for his clients as high as 181 percent.

11

27. Ultimately, Richmond and Ravich executed their strategy by first waging a proxy fight for control of Rockwell. Upon information and belief, from the time they began to execute their strategy, Richmond and Ravich intended to remove the truly independent members of Rockwell's Board in order to execute a common scheme to take control of the Board and then enrich themselves at the expense of Rockwell and its shareholders in violation of their fiduciary duties.

28. During Richmond's and Ravich's proxy fight, Rockwell filed suit against Richmond, Ravich, and certain Rockwell shareholders controlled by both (the "Richmond/Ravich Shareholder Group") in the United States District Court for the Eastern District of Michigan on March 8, 2017 seeking declaratory and injunctive relief relating to alleged violations of Section 13(d) of the Securities Exchange Act of 1934, as amended, and the rules promulgated thereunder. That lawsuit alleged that members of the Richmond/Ravich Shareholder Group intentionally failed to file certain required Schedule 13-Ds, and filed multiple materially misleading Schedule 13-Ds and 13-Gs. That lawsuit also alleged that Richmond falsely represented that he had sole voting power over all of his clients shares, approximately five million shares (approximately ten percent of the shares outstanding), when in fact Richmond himself personally owned less than one percent of outstanding shares. The Richmond/Ravich Shareholder Group asserted

counterclaims against Rockwell in that suit. Ultimately settlement negotiations were entered into.

29.     Upon information and belief, while the Board was negotiating what would ultimately become the First Settlement Agreement with the Richmond Shareholder Group, Cooper was engaging in self-dealing by entering into undisclosed and unauthorized separate discussions with Richmond to reach an agreement that would result in Cooper ultimately receiving higher compensation. These separate discussions were not disclosed to Rockwell management, including Chioini, the CEO, or to the Board. Cooper was required to disclose these discussions, the existence of which was material. In failing to make those disclosures, and by engaging in self-dealing, Cooper may have violated Regulation FD as well as violating, and causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

30.     Cooper's intent through these negotiations was to craft a settlement agreement that allowed both Richmond and Cooper to achieve their goals of self-enrichment at Rockwell's expense. Richmond would receive influence over the Board and repayment for his proxy fight, while Cooper would have his friend, Lisa Colleran, placed on the Board; would replace the Board's Lead Independent Director, Bagley, with Cooper himself; and would stop a qualified and independent candidate for the Board, David Domalski, from being appointed to the Board.

13

Bagley would also permanently lose his directorship as of the 2018 Annual Shareholders Meeting. These three actions would collectively have given the initial members of the scheme control of the Board after the First Settlement Agreement.

31.    Cooper also at this time selectively disclosed Rockwell's confidential MNPI to Richmond alone without prior notice to or permission from the Board or Rockwell management. Cooper disclosed material information regarding a potential challenge and litigation to Rockwell's intellectual property to Richmond. Upon information and belief, Cooper disclosed this information so that Richmond could utilize it to pressure Bagley, Boyd, and Chioini into accepting a settlement with the terms Cooper reached with Richmond in secret, unauthorized negotiations. This disclosure of MNPI was a violation of SEC Regulation FD, which remains uncured and which may potentially have led to insider trading or market manipulation.

32.    When the full Board finally learned of his disclosures, Cooper did not try to conceal who he was intending to benefit by them. In fact, he told the Board and Rockwell legal counsel, during a meeting of the Board, making materially false and misleading statements—on which the Company relied—that his actions were taken solely with regard to his own best interests. Cooper thereby admitted to self-dealing and breaching his fiduciary duties of care, loyalty, and good faith.

33.     On November 22, 2017, Rockwell and the Richmond/Ravich Shareholder Group entered into a Settlement and Standstill Agreement (the "First Settlement Agreement"), the terms of which were disclosed by Rockwell in a Form 8-K dated November 22, 2017, and filed November 29, 2017.

34.     The First Settlement Agreement required Rockwell to, *inter alia*, pay the Richmond/Ravich Shareholder group $895,000 of the approximately $1.4 million they expended in their proxy fight—approximately two-thirds of which was to go to Richmond and one-third to Ravich. Rockwell was also required to add one director to the Board by February 15, 2018 (the "Additional Director"). In the event an Additional Director was not added by that date, the Richmond Group would be entitled to nominate directors to the Board by February 28, 2018, which directors would be elected at the 2018 Annual Shareholder Meeting. Finally, Rockwell was required by the First Settlement Agreement to name either Cooper or the Additional Director to be the Board's Lead Independent Director by February 15, 2018. In exchange, the Richmond/Ravich Shareholder Group was required to, *inter alia*, vote in favor of the directors nominated by the Board at the Annual Shareholder Meeting and vote against proposals or resolutions to remove any member of the Board. Finally, the First Settlement Agreement stated that the Richmond/Ravich Shareholder Group "shall not, directly or indirectly, in any manner, alone or in concert with others," take certain actions, including that it shall

not "consciously work in parallel, or otherwise participate in a joint activity or course of action, with any person (other than the Company or any of its officers or directors) toward acquiring control or otherwise exercising a controlling influence over the management and policies of the Company, whether or not pursuant to an express agreement."

35.     It was understood by the Board that meeting the February 15, 2018 deadline to add the Additional Director to the Board was crucial to Rockwell's best interests. In particular, if the deadline was missed, the Richmond/Ravich Shareholder Group would become entitled to run a costly, disruptive, and damaging proxy fight at the 2018 Annual Shareholders Meeting. The need to avoid that proxy fight—an event likely to cost significantly more for Rockwell than it would for the Richmond/Ravich Shareholder Group—would also give the Richmond/Ravich Shareholder Group significant leverage over the Board in any renewed settlement negotiations to avoid the fight. Moreover, the $895,000 payment to the Richmond/Ravich Shareholder Group made as part of the First Settlement Agreement would essentially become a wasted outlay, as the Richmond/Ravich Shareholder Group would have become entitled to restart the proxy fight the payment was meant to end.

## C. Defendants Conspire to Add Unqualified Director Candidates to Rockwell's Board to Further their Scheme to Enrich Themselves.

36.     Unbeknownst to Plaintiffs, Richmond and Ravich were already actively conspiring with Cooper, Ravich, certain persons not affiliated with Rockwell, and possibly Smith, to add only directors who would join the scheme to enrich themselves at the Company's expense. In the event, Cooper, Smith, and Ravich would force a stalemate on the Board and refuse to agree to add any Additional Director who would not be loyal to Richmond and the scheme. This plan was executed in part through a secret agreement between Cooper, Smith, and Ravich to vote against any candidate they did not put forward themselves.

37.     Purportedly in an effort to aid the Board's search for the Additional Director, Smith recommended the Board enter into a contract with a recruiter, Jodi Emery ("Emery"), the founding partner of Ignite Search Partners ("Ignite"). Smith represented to the Board that she not only had no relationship with either Emery or Ignite prior to this search, but that Smith in fact had never met Emery before. Plaintiffs later discovered both these representations were false, and Emery eventually admitted that she and Smith knew each other prior to the search.

38.     Smith and Emery worked together to manipulate the new director evaluation process. Specifically, Smith, without notification to Plaintiffs, Boyd, or Bagley, directed Emery to submit negative reviews for any candidates unacceptable to Smith, Cooper, Ravich, and Richmond. However, as Bagley, Boyd, and Chioini refused to assent to the unqualified candidates put forward by

17

Smith, and as Smith, Cooper, and Ravich refused to assent to any candidate who would not join their scheme to enrich themselves and Richmond, a stalemate ensued, and the Board failed to elect an Additional Director by the February 15, 2018 deadline.

39.     Smith also used the February 15, 2018 deadline to add an Additional Director to the Board, and the potentially catastrophic consequences to Rockwell should the Board miss that deadline, as leverage to force the Board into accepting one of Smith's handpicked nominees to further the scheme to enrich herself, the other Defendants, and Richmond at Rockwell's expense.

40.     Smith's first choice for an Additional Director was George Bickerstaff ("Bickerstaff"). Upon information and belief, Smith preferred Bickerstaff not only despite, but because of his exorbitant demand that he receive $250,000 in annual compensation—more than four times the $60,000 in annual compensation the Board was receiving at that time. Upon further information and belief, Smith wished to use Bickerstaff's unreasonably high compensation demand as an excuse to increase the compensation to *all* independent directors—including herself.

41.     Smith and Emery also helped Bickerstaff conceal from the Board intentional material misstatements and omissions from Bickerstaff's resume. Bickerstaff also misstated both his past performance on other corporate boards and the compensation he received from his service on those boards. Upon information

18

and belief, Smith and Emery were each aware of these misstatements but nevertheless failed to disclose them. When the misstatements were revealed to the Board by Rockwell's outside advisors' search of public records, Smith, Cooper, and Ravich nevertheless maintained their support for Bickerstaff.

42.     Emery also failed to disclose her own conflicts of interest with regard to Bickerstaff's candidacy. In particular, Emery and Bickerstaff had a prior relationship which was not disclosed to the Board. Bickerstaff not only sat on the advisory board of Emery's company, Ignite, but had worked with Emery for many years. Emery also failed to disclose that she and Bickerstaff were personal friends and neighbors. Indeed, every candidate Emery would ever recommend as her top and only choices to join the Board—including Wolin, who ultimately was appointed a director—had material, non-disclosed, pre-existing relationships with Emery.

43.     Smith only withdrew her support for Bickerstaff when it became apparent that a majority of the Board would never support his candidacy. Smith then changed her focus to her second preferred candidate, Elena Kogan ("Kogan").

44.     Kogan was a second candidate put forward by Emery. Kogan, like Bickerstaff before her, had an undisclosed prior relationship with Emery dating back to their time working together at Ariad Pharmaceuticals. Smith was aware of

19

this prior relationship and the conflict of interest it created for Emery, but nevertheless failed to disclose those conflicts to the full Board.

45.   Kogan had no prior experience serving on the board of a public company and could not garner a majority of the Board's vote, so the Board attempted to reach a compromise: Kogan would be added to the Board, but only in conjunction with the addition of a second, more experienced and highly qualifed nominee: AJ Nassar ("Nassar"). Nassar accepted, and when Kogan was notified of the compromise, she initially accepted enthusiastically.

46.   However, Smith—recognizing that if Nassar was added to the Board at the same time as Kogan, she and the other members of the scheme would not have control of the Board—quickly took steps to sabotage the compromise agreement.

47.   First, upon information and belief, Smith and Emery convinced Kogan to reverse her initial acceptance of the compromise and to notify the Board that she would only accept an offer to join the Board if Nassar was not included.

48.   Second, Smith instructed Emery to attempt to torpedo Nassar's candidacy by submitting a negative evaluation of him. Smith's instructions to Emery were discovered by the Board when, on February 7, 2018, at 6:11 PM, Smith forwarded Emery's purportedly neutral, negative evaluation of Nassar to the Board. But Smith failed to delete from the email a chain of prior conversations

between Smith and Emery, in which Smith and Emery discussed their intentions to use Emery's influence as an outwardly neutral consultant to achieve Smith's desired outcome.

49.    In one of those prior emails, also sent February 7, 2018, at 2:05 PM, Smith instructed Emery to make negative statements in her report about Nassar in order to counteract the apparent preference of Chioini, Boyd, and Bagley to nominate Nassar as the new director. Smith also instructed Emery to say at least a couple positive things about Nassar to avoid angering him, as Nassar held a significant stake of Rockwell stock.

50.    Separately, at an earlier date, upon information and belief, Smith also received information which she admitted originated with Richmond regarding a bankruptcy at one of Nassar's prior businesses many years earlier. This information was however already known to the Board and determined to not be disqualifying for his candidacy. It is not known whether Smith requested this information or why Richmond was involved in the Board's process of selecting the information, particularly as Richmond had previously notified the Board, in writing, that he would not be reviewing any of the Additional Director candidates.

51.    Emery's report reflected Smith's instructions.

52.    Third, in the same chain of emails, Smith told Emery, in an email also sent February 7, 2018, at 2:10 PM, the content of a conversation Smith had with

21

John Markson ("Markson"), the Board's executive compensation consultant. Smith had referred Markson to the Board after working with her in the past. Smith told Emery that Smith had convinced Markson to alter his analysis of proper director compensation to increase what Directors would receive relative to his original, un-manipulated director compensation report. After reviewing these emails, Plaintiffs, Boyd, and Bagley held a reasonable and well-evidenced belief that Smith had intentionally manipulated, and was continuing to manipulate, the process to nominate a new director in order to take control of the Board and significantly increase her own compensation. As discussed, *infra*, Smith's manipulation of Markson's analysis without disclosure to the shareholders may have caused the Company to violate federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

53.     Due to the machinations of Cooper, Smith, and Ravich, the Board was unable to come to an agreement on a new director. Cooper, Smith, and Ravich forced a stalemate by refusing to appoint any candidate that they had no prior direct or indirect relationships with. The Richmond/Ravich Shareholder Group became entitled to wage a second proxy fight, and now had the leverage they needed to finally take control of the Board.

**D. Richmond, Smith, Cooper, and Ravich Take Control of the Board by Causing Directors to be Chosen who were Secretly Loyal to the Scheme, Not the Company, Giving Defendants and Richmond Sufficient Control to Defraud Rockwell's Shareholders.**

54.     By forcing this stalemate, Smith, Cooper, and Ravich, working with Richmond, were able to force the Board to reenter negotiations with the portion of the Richmond/Ravich Shareholder Group controlled by Richmond (the "Richmond Shareholder Group"). The resulting agreement, entered into on March 7, 2018 (the "Second Settlement Agreement"), would result in Defendants and Richmond taking control of the Board.

55.     In an effort to further and protect their work to take control of the Board, Smith and Ravich used their positions as, respectively, chair and member of the Board's Governance and Nominating Committee, along with Cooper, to hire additional legal counsel. This counsel was used to force the Board into a settlement with the Richmond/Ravich Shareholder Group by preventing the Board from running its own proxy fight, forcing the Board to accept a settlement on terms favorable only to Defendants and Richmond. That counsel, among other things, was used to threaten to sue Boyd, Bagley, and Chioini personally if they attempted to run a proxy fight.

56.     Upon information and belief, while Chioini was negotiating the Second Settlement Agreement with the Richmond Shareholder Group, Smith, Cooper, and Ravich were having undisclosed and unauthorized separate discussions with Richmond to reach an agreement that would enable them to seize control of the company and ultimately receive higher compensation. These

separate discussions were not disclosed to Rockwell management or the Board as a whole, including Chioini, the CEO, Bagley, and Boyd. The non-disclosure of these conversations, which were not disclosed to management, the Board as a whole, or the shareholders, may have violated Regulation FD, and may have caused the Company to violate federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

57.     Defendants and Richmond were then able to force Chioini, Boyd, and Bagley to accept the Second Settlement Agreement on terms which not only gave Richmond and Ravich a significant monetary gain, but granted Defendants and Richmond sufficient control over the Board to vote themselves unreasonably high compensation, and to attempt the termination of any person who refused to abet their scheme.

58.     The Second Settlement Agreement stated that Rockwell would reimburse the Richmond/Ravich Shareholders Group for the balance of the money, $428,000, which Richmond expended in the proxy fight. Upon information and belief, there was no preexisting duty for Rockwell to reimburse Richmond for these significant expenses.

59.     Under the Second Settlement Agreement, Bagley was required not to stand for re-election to the Board at the 2018 Annual Shareholder's Meeting, potentially expanding the extent of Defendants' and Richmond's control over

Rockwell. Rockwell would also be required to propose to the shareholders at that Meeting that the terms served by directors be "destaggered," so that each director stood for reelection to the Board at every annual shareholder meeting.

60.     The Second Settlement Agreement further stated that Chioini     would be the only "Board-nominated candidate for election" at the 2018 Annual Shareholder's Meeting. The Richmond/Ravich Shareholder Group agreed to vote in favor of Chioini.

61.     The Richmond/Ravich Shareholder Group further agreed to vote in favor of the Rockwell 2018 Long Term Incentive Plan as approved by the Board on January 29, 2018 (the "Original LTIP"), a priority for the Board.

62.     The Second Settlement Agreement further provided that Chioini, Klema, and Rockwell's Chief Medical Officer, Raymond D. Pratt ("Pratt") would each enter into new employment agreements with Rockwell.

63.     Finally, the Second Settlement Agreement resulted in two new Directors being added to the Board: Wolin and Colleran. Wolin and Colleran were presented to the Non-conflicted Directors as independent, well-qualified individuals who had no prior relationship with Richmond, the Richmond/Ravich Shareholder Group, or the Conflicted Directors then on the Board. The Non-conflicted Directors would come to discover that those representations were all false.

25

64. After the Second Settlement Agreement was entered into and disclosed to the public, a Proxy Statement was filed which disclosed that the leadership and composition of certain Board Committees had been immediately changed, placing Ravich as the Chair of the Compensation Committee, Wolin as the Chair of the Board, and removed Boyd from all committees except for the Audit Committee. These actions were discussed, considered, and agreed to by Defendants in secret, then announced to the Board as a whole as a *fait accompli*.

65. On April 17, 2018, a Form 8-K was filed which announced that Rockwell, Richmond, and an entity controlled by Richmond, Richmond Brothers, Inc. ("RBI") had entered into an Amendment to the Second Settlement Agreement. The Amendment stated that, assuming certain recommendations were given, Richmond and RBI would cause their shares to be voted in favor of, and would further recommend that their shareholders (1) vote in favor of reelecting Chioini to the Board at the 2018 Annual Shareholders Meeting, and (2) vote in favor of a revised 2018 Long Term Incentive Plan (the "Revised LTIP"). However, the Form 8-K failed to state that the Revised LTIP had been manipulated, without following the Bylaws and without sufficient notice to the Non-conflicted Directors, to increase Director pay by approximately 275% over their 2017 pay, or approximately 50% over the non-manipulated compensation analysis performed by a neutral compensation consultant, and 178% over the appropriate, current peer

analysis performed by Institutional Shareholder Services ("ISS"), an independent proxy advisory firm. All Directors were aware of the ISS analysis prior to increasing their compensation using the manipulated analysis done by Markson. Both Boyd and Bagley, who both stood to potentially gain from the LTIP, nevertheless voted against the LTIP.

66.     The Revised LTIP also awarded the Board stock options at the stock's price as of that day in March, $5.75 per share, for an equity plan that would not be voted on for several months, on June 21, 2018. The stock options that the Revised LTIP purported to award were for stock that had not been created, and which could only be created by affirmative vote of the shareholders. The Revised LTIP also materially changed the manner in which directors—and only directors—would receive equity compensation. In particular, before the Revised LTIP, all stock options issued by the company vested at a rate of one-third per year over the course of three years, and could be exercised any time over the ninety days following the termination of that director's employment. Under the Revised LTIP, however, the stock options became significantly more valuable: all options vested in the first twelve months, and the period to exercise was extended from ninety days to ten years. These actions applied to the Directors only, excluding management, employees, and all others—an unjustified derivation from twenty years of Rockwell practice.

67.     Finally, the Revised LTIP purported to compensate Defendants, as independent but conflicted directors, with additional cash in lieu of stock options which the shareholders refused to approve at the 2016 and 2017 Annual Shareholder Meetings.

68.     Despite these serious legal concerns, Defendants voted in favor of the Revised LTIP and the Amendment to the Second Settlement Agreement. Moreover, usual and customary Board processes were violated to approve the compensation plan: there was neither a meeting of the Compensation Committee nor any discussion of the Board at the Meeting. The Revised LTIP was approved over the dissenting votes of Boyd and Bagley.

69.     Throughout the negotiations over the First Settlement Agreement, the Second Settlement Agreement, and the Amendment to the Second Settlement Agreement (collectively, the "Settlements"), Ravich and Cooper were communicating MNPI which belonged to Rockwell to Richmond, Wolin, and Colleran. In so doing, Ravich and Cooper materially impacted Rockwell's ability to negotiate the Settlements on an even playing field and violated their fiduciary duties of loyalty to Rockwell as directors. These disclosure to Richmond, without disclosure to the Shareholders may have caused the Company to violate federal anti-fraud securities laws, including Section 10(b) and SEC Rule 10b-5.

28

70.     Ravich admitted on at least three occasions that he was sharing MNPI, including inside information, with Richmond. For example, on one board call, Ravich proposed that a clause be put into the Proxy that targeted Chioini specifically by restricting Chioini from receiving any equity, regardless of his performance, between the 2018 and 2019 Annual Board Meetings. This would have potentially breached the Settlement Agreement with Richmond, and this was indicated to Ravich. Ravich then stated, and reiterated, that he had already discussed the proposal with Richmond, and received approval of it. These three disclosures may have, collectively, either violated Regulation FD or caused the Company to violate federal security antifraud rules.

71.     Defendants took an additional step to enrich themselves at Rockwell's expense when they voted, without following regular order as laid out in the Bylaws and without sufficient notice to Boyd, Bagley, and Chioini, to dramatically increase annual compensation to Board members. Specifically, Defendants again instructed Markson, the executive compensation consultant selected by Smith, to manipulate his analysis. Markson's analysis was manipulated, under Smith's instructions, so that it would appear directors at peer firms were receiving significantly more compensation than peer directors truly were receiving. This was accomplished by including "peer" companies with substantially higher market capitalizations to generate the report. As a result Defendants were able to triple the

29

proposal for their annual compensation, from approximately $81,000 to approximately $225,000. Failure to disclose this manipulation, the happening of which constitutes material information, may have caused the Company to violate federal securities anti-fraud rules, including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

72.     At around the same time, the Board determined that though the Directors were entitled to exorbitant increases in annual compensation and stock options, Rockwell's management was overpaid. By using a different peer group of companies for executive compensation than the peer group used for director compensation, the implicated Directors attempted to reduce management's pay. In an effort to redirect compensation to the Board instead of management, and contrary to established and ordinary practice, some executive managers received no 2017 annual bonuses whatsoever, while others received only a comparatively small bonus. Also inconsistent with established practice, executive management received no equity.

73.     Defendants also ordered a second, manipulated analysis to be performed on compensation for Rockwell's executives. The analysis was entirely inconsistent with standard practice. Markson's use of two different peer firms to create his reports—making comparisons to one group of firms for Directors, and to

another for management—is further evidence that his reports were improperly manipulated to misleadingly benefit Defendants above and beyond all others.

### E. Each Defendant Failed to Disclose Material Information Regarding Past Allegations of Misconduct, Connections to the Richmond/Ravich Shareholder Group or Others, and/or Other Matters.

74.     In addition to conspiring amongst each other and with Richmond to hijack the company to enrich themselves and, as shown herein, terminate Plaintiffs' employment in retaliation for filing an SEC Whistleblower Complaint in violation of the Dodd-Frank Act and Michigan law, each Defendant has failed to disclose material information about themselves, including the foregoing allegations.

#### 1.  *Material Misrepresentations of Own Qualifications Made by Smith.*

75.     Smith failed to disclose, orally, on her director questionnaire, or otherwise, her involvement in an SEC investigation which led to her resignation as the CEO of NeoStem, Inc. ("NeoStem"), a publicly traded company that has since changed its name to Caladrius Biosciences, Inc. As CEO of NeoStem, Smith was investigated by the SEC for her role in an alleged stock pumping scheme. In that scheme, Smith allegedly paid an outside company, Lidingo Holdings, LLC ("Lindingo"), to write more than 100 articles touting her company's stock between April 2012 and March 2014. None of those articles tied the payment for the articles back to NeoStem or Smith. However, Smith's resignation from Neostem is

believed to be a direct consequence of the SEC's investigation into her behavior. Had the Board been aware of that investigation and the resonation it led to at the time of her nomination, she would not have been nominated. The SEC filed an action against Lidingo and others on the basis of its non-disclosed stock pumping in the U.S. District Court for the Southern District of New York on April 10, 2017, Case No. 17-cv-2540.

76.     Smith failed to disclose the existence of a related party transaction. Upon information and belief, Smith has, without disclosure, recommended transactions to the company in which she receives a kickback or other compensation from the other party in the transactions. In particular, upon information and belief, Smith referred a vendor to the company without disclosing that, if that vendor was selected, it would have paid Smith a referral fee. If proven true, the Company may be required to issue restatements of financial statements

77.     As described *supra*, Smith actively disguised her pre-existing relationship with Emery, the search consultant who helped the firm in its search for the Additional Director. Smith told the Board that she had never met Emery before, which was false. As described herein, Emery and Smith acted in concert to ensure that no person was added to the Board who would not collaborate with Defendants' scheme to enrich themselves at Rockwell's expense by disguising the faults of

candidates Smith approved of and submitting misleadingly negative reviews of candidates Smith disapproved of.

78.    As described *supra*, Smith failed to disclose the extent of her relationship with Markson, the compensation consultant. Smith used that relationship to ensure Markson would manipulate his analysis to Defendants' liking.

79.    Smith's failure to disclose the foregoing information to the Board, management, and shareholders, all of which was material, may have caused the Company to violate federal securities anti-fraud rules including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### 2. *Material Misrepresentations of Own Qualifications Made by Cooper.*

80.    Cooper failed to disclose, orally, on his director questionnaire, or otherwise, two prior class-action lawsuits that he faced as the Chief Financial Officer and later Chief Executive Officer of Discovery Laboratories, Inc. ("Discovery Labs"), now known as Windtree Therapeutics, Inc.

81.    In the first lawsuit, Cooper was accused of, *inter alia*, personally selling his stock in Discovery Labs while shareholders were unaware of certain material issues with manufacturing.

82.    In the second lawsuit, the management of Discovery Labs, including Cooper, was accused of making materially false and misleading statements to

33

investors and artificially inflating the price of Discovery Labs' stock by indicating that the company's drug, Surfaxin, was on track to be approved by the FDA, despite an awareness of significant FDA deficiencies that prevented approval.

83.    Cooper failed to disclose to the Board or management that Colleran had worked as a consultant for Cooper and Discovery Labs for approximately two years.

84.    Cooper failed to disclose his sharing of material, non-public, confidential information belonging to Rockwell including, *inter alia*, undisclosed discussions with Richmond intended to obtain a settlement of the Richmond/Ravich Shareholder Group proxy fights which enriched Cooper at the expense of Rockwell and its shareholders.

85.    Cooper's failure to disclose the foregoing information to the Board, management, and shareholders, all of which was material, may have caused the Company to violate federal securities anti-fraud rules including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### 3.  Selective Disclosures Made by Ravich.

86.    Ravich failed to disclose his sharing of material, non-public, confidential information belonging to Rockwell, including, *inter alia*, undisclosed discussions with Richmond regarding a potential significant change in management compensation, information regarding internal discussions on the sale

34

of Rockwell's "concentrate business," future financing, and information on the sale, pricing, and other information concerning Triferic. Those disclosures of MNPI were in violation of SEC Regulation FD which remain uncured and which may potentially have led to insider trading or market manipulation.

87.     Upon information and belief, either Ravich or Cooper also disclosed to Richmond material, non-public, confidential information from the FDA regarding the Company's Calcitriol drug manufacturing submission. In particular, Richmond obtained sufficient information to determine, and communicate to other investors, that "bad news" would soon be released with regard to Calcitriol. Upon information and belief, the only way Richmond could have come by this MNPI was through Cooper or Ravich. Neither Cooper nor Ravich disclosed this sharing of MNPI, a violation of SEC Regulation FD that remains uncured.

### 4.  *Material Misrepresentations of Own Qualifications Made by Wolin.*

88.     Wolin, who like Bickerstaff and Kogan was recommended to the Board by Emery, was also a member of the advisory board to Emery's company, Ignite. Emery and Wolin failed to disclose this conflict of interest, instead affirmatively representing that she had no prior relationship with Wolin.

89.     Had this preexisting relationship been known, Wolin would not have been elected to the Board.

90.    Wolin's failure to disclose the foregoing information to the Board, management, and shareholders, all of which was material, may have caused the Company to violate federal securities anti-fraud rules including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### 5. *Material Misrepresentations of Own Qualifications Made by Colleran.*

91.    Colleran failed to disclose the extent of her prior relationship with Cooper, including her work as a consultant for Cooper at Discovery Labs. In particular, this information was absent from the otherwise detailed biography and resume she submitted to the Board, as well as the Company's director questionnaire she completed.

92.    Had the Board known that Colleran disguised the extent of her relationship with Wolin at the time of her nomination, Colleran would not have been elected to the Board.

93.    Colleran's failure to disclose the foregoing information to the Board, management, and shareholders, all of which was material, may have caused the Company to violate federal securities anti-fraud rules including Section 10(b) of the Exchange Act and SEC Rule 10b-5.

### F.  Chioini and Klema File the Whistleblower Complaint with the SEC.

94.    On Thursday, May 17, 2018, Chioini and Klema filed a Complaint with the SEC alleging, upon information and belief, that Cooper, Ravich, and

Smith violated their fiduciary duties by sharing material, confidential, and non-public information to Richmond, including as detailed herein, violating the SEC's Regulation FD, despite explanation of that Regulation's requirements by Rockwell counsel; manipulating the process of selecting new directors to the Board; failing to make certain material disclosures, which are outlined in part herein; and manipulating executive recruiters and compensation reports without making required disclosures related thereto.

95.    The Whistleblower Complaint also briefly outlined the method used by Smith, Cooper, and Ravich to maintain control of the Board, noting that they are "only permitting director candidates to be considered with whom they believe will conspire with them."

96.    Chioini and Klema further alleged to the SEC that Wolin and Colleran failed to make appropriate disclosures of material relationships in an attempt to further and to conceal the scheme.

97.    Finally, the Whistleblower Complaint further alleged, upon information and belief, that Smith had, without disclosure, recommended transactions to the company in which she receives a kickback or other compensation from the other party in the transactions. If proven true, the Company may be required to issue restatements of financial statements

98.    Plaintiffs further reported the allegations made in the Whistleblower Complaint to NASDAQ, FINRA, and the U.S. Department of Justice. NASDAQ halted trading on Rockwell's stock as a result of the conflicting, material information put into the public by the five Defendants.

**G. The Company Receives the Shareholder Demand Letter**

99.    On Monday, May 21, 2018, Chioini and Klema received the shareholder Demand Letter. The Demand Letter, itself dated May 18, 2018, alleged, *inter alia*, breaches of fiduciary duty on the part of Wolin, Colleran, Ravich, and Smith, as well as wrongdoing by Richmond, and demanded an investigation of their allegations.

100.    The Demand Letter first alleged that Ravich had disclosed material, confidential information to shareholders including, but not limited to, Richmond in breach of his fiduciary duties and of federal securities laws. These disclosures allegedly included information regarding internal discussions on the sale of Rockwell's "concentrate business" and financing, as well as information on the sale, pricing, and other information concerning Triferic. If true, these disclosures would constitute a violation of Regulation FD, which remains uncured and may potentially have led to insider trading or market manipulation.

101.    Second, the Demand Letter alleged that Wolin, Colleran, and Ravich, in a conspiracy which included Richmond, committed a waste of corporate assets.

Specifically, the Demand Letter pointed to the exorbitant increases in director compensation outlined herein, including an increase in annual compensation from approximately $60,000 per director per year to $250,000, as well as the 275,000 front-priced stock options from a non-existent equity plan. This allegation also pointed to the approximately $1.4 million paid to the Richmond/Ravich Shareholder Group through the First and Second Settlement Agreements.

102.   Third, the Demand Letter made allegations against Smith individually. These allegations included, *inter alia*, that she aided and abetted, and conspired with, Wolin, Colleran, Ravich, and Richmond to commit those actions noted herein.  The allegations continued to allege that Smith wrongfully withheld the information regarding her past actions at Neostem, including the allegations in this Complaint.

103.   Documents filed in the Oakland County Circuit Court by Boyd and Bagley confirm that the Independent Directors have been advised that the SEC has opened a case against Defendants and is in the process of investigating the matters alleged in the Whistleblower Complaint and the Demand Letter.

**H. Defendants Unlawfully Retaliate Against Chioini and Klema by Purporting to Terminate them in Contravention of their Employment Agreements, the Rockwell Bylaws, and Applicable Law.**

### 1. The Events of Monday, May 21, 2018.

104.   After they received the Demand Letter, Chioini and Klema disclosed it, as well as the Whistleblower Complaint, to the two Directors not implicated by it or the substantially similar allegations in the Whistleblower Complaint, and thus not conflicted by the matters therein, Boyd and Bagley. Both Boyd and Bagley believed that the appropriate course of action was to hire outside counsel to perform an independent investigation into the allegations.

105.   Plaintiffs then disclosed the Demand Letter, as well as the Whistleblower Complaint, to a company attorney and Rockwell's auditors, Plante Moran, on May 21, 2018. Plante Moran confirmed that an independent investigation, undertaken and supervised by the non-implicated, independent Directors and performed by an outside law firm, was both customary and the best practice, as well as the appropriate means of moving forward.

106.   Plante Moran also stated at this time that a restatement of financial statements may be necessary depending on the outcome of the independent investigation into the allegations. In particular, a restatement of financial statements might be necessary due to Smith's possible related party transaction, as discussed herein.

107.   Chioini then announced an Emergency Board Meeting to take place that evening, Monday, May 21. All Directors were given and received proper notice of the May 21 Emergency Board Meeting, and all Directors responded to the notice, delivered via email, by accepting the accompanying calendar invitation.

108.   However, Defendants immediately began to attempt to delay the meeting into later in the week, often on the basis that there was no rush to hold the meeting. Chioini found there was no legitimate or non-pre-textual reason to delay the meeting and held the conference call as scheduled. No Director indicated there was a sense of urgency, or that the Board needed to meet immediately to terminate the CEO; indeed, there was no indication that any termination whatsoever was being considered.

109.   The May 21 Emergency Board Meeting, held telephonically in accordance with the Bylaws, was missing all five Defendants—including those who never stated that they were unavailable for the meeting and those who merely professed a preference to delay the meeting, as opposed to a need to do so due to scheduling conflicts. No notice was given to Boyd, Bagley, or Chioini that the five Defendants would not be joining the call. Therefore, the participants in the Emergency Board Meeting were limited to Bagley, Boyd, Chioini, Klema, Rockwell's SEC Counsel, Steven Barth of Foley & Lardner LLP ("Barth"), and Rockwell General Counsel Michael Costello ("Costello"). The participants

41

discussed the Demand Letter and Whistleblower Complaint, and the two Non-conflicted Directors, Boyd and Bagley, determined that Wolin, Smith, Ravich, Colleran, and Cooper were conflicted and would not be able to participate in any form in the independent investigation into the allegations.

110.   After the May 21 Emergency Board Meeting, Klema, on behalf of Chioini, called a Special Meeting of the Board to take place on Tuesday, May 22, 2018, at 6:00 PM pursuant to the Bylaws. At this time, Klema also informed the full Board that he and Chioini had filed the Whistleblower Complaint with the SEC.

111.   After the May 21 Emergency Board Meeting, Boyd and Bagley engaged the services of Dickinson Wright to perform an independent investigation into the allegations of the Demand Letter, as suggested by Plante Moran.

112.   Wolin almost immediately asked Klema, by email addressed to Klema alone, for access to the Whistleblower Complaint. Klema did not respond to Wolin's request, believing it was inappropriate given Wolin's conflicts of interest in the matter.

### 2. *The Events of Tuesday, May 22, 2018.*

113.   Upon information and belief, the morning of May 22, 2018, the five Defendants held a secret meeting, without notice to or the ascent of Boyd, Bagley,

or Chioini, and decided to hijack that evening's Special Board Meeting and terminate Chioini.

114.   At the May 22 Special Board Meeting, the five Defendants refused to follow regular order and acted in blatant disregard of the Bylaws and their fiduciary duties. The attendees included Chioini, Boyd, Bagley, the five Defendants, Barth, Costello, and counsel for Chioini and Klema, Teresa Goody ("Goody"), and counsel purportedly representing Rockwell. The meeting was conducted telephonically in accordance with the Bylaws.

115.   Immediately after the meeting was called to order and roll was taken, Chioini attempted to begin addressing the topics of the meeting: the Demand Letter and Whistleblower Complaint. Wolin immediately cut Chioini off and made a motion to terminate Chioini's position as CEO of Rockwell. Chioini and his counsel, Goody, immediately objected to the propriety of Wolin's motion, on the basis that it was out of order, the meeting having been called for the specific purpose of discussing the allegations in, and the proper means of handling, the Whistleblower Complaint and the Demand Letter. Wolin refused to recognize the objections, talking over Chioini and Goody, and moved forward with his motion.

116.   The vote on the motion to terminate Chioini's position as CEO proceeded entirely outside regular order:

   a.   No discussion was permitted on the objections to the motion itself;

b. Nor was any discussion permitted on the content of the motion, i.e., whether or not to fire Chioini from his position as CEO; in particular, neither Boyd nor Bagley was permitted to speak;

c. During the vote itself, after the five Defendants immediately followed Wolin and voted in favor of the motion, Bagley was permitted to vote against the motion, but Boyd was not permitted to vote;

d. The five Defendants should not have been permitted to cast a vote, as they were conflicted in the matter; and

e. Immediately after Bagley cast his no vote, the five Defendants disconnected.

117. The coordinated action taken by Defendants and Richmond to immediately derail the Special Board Meeting, make an out-of-order motion to terminate Chioini from his position as CEO, and to disconnect in a uniform manner immediately after the vote evidences the existence of a common scheme between Defendants.

118. At 7:19 PM on May 22, 2018, Defendants, without any notice to Bagley or Boyd, issued a Press Release. The Press Release purported to have been issued by the entire Board. That press release made at least two materially false and misleading statements:

44

a. First, it falsely stated that "Chioini resigned as a member of the Board."

b. Second, it included the false quote, attributed to Wolin, that the Board had "completed a top to bottom review of our business," and concluded that firing Chioini was the proper course of action. Upon information and belief, no such review actually occurred. Neither Bagley, Boyd, nor Chioini was given any notice, or possess any evidence tending to show, that such a review was taking place.

119.   Despite Defendants' contention that the termination of Chioini was planned far in advance, just weeks earlier, the full Board approved a Proxy Statement that approved of Chioini's nomination for re-election to the Board. The Proxy Statement went to print April 24, 2018, and was only released to shareholders on April 30, 2018.

120.   Also on May 22, 2018, after the Board Meeting and no later than 10:55 PM, Wolin emailed Klema, copying Costello, Barth, Cooper, and Smith. Wolin, purporting to speak "[o]n behalf of the Board," directed Klema "to shut down [Chioini's] computer" and disable Chioini's access to the Rockwell's computer network, which would include Chioini's email. Wolin told Klema that "Failure to do so could result in termination for cause," and told Klema to "confirm when this action is complete." Klema, following the directives of the only two non-

conflicted Directors, refused to take these actions. Despite Wolin supposedly acting on the Board's behalf, neither Boyd, Bagley, nor Chioini was given notice that this email would be sent or gave their assent to its contents.

121.   Indeed, neither Boyd nor Bagley was given prior notice (and in some cases subsequent notice) of any of the actions taken by Defendants on May 22, 2018. Both Boyd and Bagley took the position then, and maintain now, that the purported termination of Chioini was neither effective nor prudent; that Chioini had never resigned any position, including his directorship; that Defendants were improperly taking action in a matter for which they had substantial conflicts of interest vis-à-vis Rockwell; and that Klema should properly be taking direction from only Chioini, Boyd, and Bagley. These positions are buttressed by the Rockwell Principles of Corporate Governance, adopted and effective as of March 23, 2017, which govern corporate ethics, and their understanding of applicable law, which require directors to recuse themselves from any vote which concerns a matter they hold a conflict for.

122.   Following the proper direction of Boyd and Bagley, who did not hold any conflict with regard to Chioini's firing or the allegations of the Demand Letter and Whistleblower Complaint, Chioini, to fulfill his fiduciary duties, drafted a Form 8-K to correct the materially false and misleading information put into the marketplace by Defendants through the May 22 Press Release.

### 3. *The Events of Wednesday, May 23, 2018.*

123. Chioini published the aforementioned Form 8-K on May 23, 2018, (the "Chioini May 23 8-K"). The Chioini May 23 8-K corrected several materially false statements, and put forth several material omissions, from the May 22 Press Release, including:

a. That the purpose of the May 22 Special Board Meeting was discussion of the Demand Letter and of the hiring of independent counsel by Boyd and Bagley to lead an independent investigation into Defendants' and Richmond's wrongdoing;

b. That the vote to fire Chioini was out of order and not effective, and that Chioini therefore remained in all positions he held prior to that vote;

c. That Chioini had, through counsel, informed the SEC of certain actions also discussed in the Demand Letter which gave rise to the independent investigation; and

d. That the independent investigation was proceeding under the supervision of Boyd and Bagley.

124. After the issuance of the Chioini May 23 8-K, Defendants took three actions: Klema was improperly terminated; a "Special Transition Committee" was

purportedly created; and a Form 8-K replete with materially false and misleading statements was issued.

125.   First, Defendants purported to terminate Klema. Defendants purported to take this action in response to Klema's part in the drafting and filing of the Chioini May 23 8-K; however, upon information and belief, Defendants had come to an agreement to terminate Klema in retaliation for the Whistleblower Complaint no later than May 22, 2018—the day before the supposedly offending Form 8-K was filed. Moreover, the Form 8-K was properly filed with authorization of the only two directors not conflicted on the matter, Boyd and Bagley.

126.   Second, Defendants purported to form a Special Transition Committee. The Special Transition Committee was purportedly formed to find a new CEO of Rockwell.

127.   Defendants failed to give any notice to Bagley or Boyd of the meeting at which Klema was purportedly fired and the Special Transition Committee was purportedly formed. Both Boyd and Bagley would have voted against both proposals had they been given notice that a Board meeting was to take place and been given an opportunity to vote. Significantly, because Boyd and Bagley are the only non-conflicted Directors with regard to these matters, they are the only directors who can vote, and their two collective votes are required to be the position of the Board as a whole.

128.   Finally, in response to the Chioini May 23 8-K, Defendants issued their own 8-K (the "Defendants May 23 8-K"). The Defendants May 23 8-K omitted that their purported terminations of Chioini and Klema would have been in violation of their respective employment agreements and included the following materially false and misleading statements:

a.   that a "thorough review of the Company's business, including an evaluation of management," took place after Wolin and Colleran were added to the Board, when no such review or evaluation took place, and if such a review or evaluation took place, it was done without notice to Boyd, Bagley, or management;

b.   that the "Board," and not Klema, "convened a meeting on May 22, 2018";

c.   that the vote at the May 22, 2018 meeting to terminate Chioini was effective, but omitting that Boyd and Bagley were excluded from the earlier discussions and not informed of the intention to fire Chioini, that regular order was not followed, that directors not entitled to vote on the matter due to conflicts and failed to recuse themselves from the vote, that the vote was not effective, that no discussion was permitted, and that Boyd was not permitted to vote on the motion;

d.  that Chioini's termination from his position as CEO constitutes a resignation from the Board pursuant to the Employment Agreement, which is false;

e.  that Chioini and Klema did not have authorization to file the Chioini May 22 8-K, when they were specifically and properly authorized to do so by Boyd and Bagley;

f.  that the "independent directors of the Board have voted to terminate Mr. Klema from his roles at the Company as well," without stating that regular order was not followed, that directors not entitled to vote on the matter due to conflicts failed to recuse themselves from the vote, and that the vote was not effective;

g.  that Klema was terminated for his part in issuing the Chioini May 23 8-K, when Defendants had decided to terminate Klema in retaliation for filing the Whistleblower Complaint before the May 22 Special Board Meeting; and

h.  that the Special Transition Committee then existed, when the vote to create that Committee was not effective, as regular order was not followed and directors not entitled to vote on the matter due to conflicts failed to recuse themselves from the vote.

129.   Defendants did not, as required by SEC Form 8-K Item 5.02(3)(i), to give advanced notice to Chioini that any 8-K would be filed regarding his alleged Director resignation.

130.   Chioini then issued a Press Release in accordance with, and with permission from, Boyd and Bagley. The Press Release reaffirmed the contents of the Chioini May 23 8-K, and reiterated that Chioini remained CEO of Rockwell. It also stated, among other things, that Chioini was not aware of any information indicating that proper governance procedures were followed when that the Special Transition Committee was created or when Klema was terminated, as noted in the Defendants May 23 8-K.

131.   After the issuance of the Defendants May 23 8-K, Rockwell filed the State Court Action in Oakland County Circuit Court, accompanied by a motion for a temporary restraining order (the "Rockwell TRO Motion"). Neither Boyd nor Bagley was given prior notice that the State Court Action would be filed, and only learned of it when informed by Goody. The State Court Action was therefore filed in violation of the Bylaws.[1]

### 4.  The Events of Thursday, May 24, 2018.

---

[1] Boyd and Bagley have entered an appearance in the State Court Action, separate from the five conflicted Directors, who are purporting to act on behalf of the Company.

132.   Defendants, without notice to or assent from Boyd or Bagley, also sent letters to Goody and Dickinson Wright stating that neither had been retained by Rockwell, and that no payment would be issued to them.

133.   On May 24, 2018, notice was served on Chioini through counsel of a Special Board Meeting to take place that evening. The notice was only signed by Defendants, and included a resolution for Chioini's termination, a resolution for Klema's termination, and additional resolutions to allow Defendants to interfere with the Independent Investigation by, *inter alia*, resolving that Dickinson Wright had never been properly retained, and that, to the extent it was properly retained, that the representation was terminated. Both Boyd and Bagley learned of the May 24 Special Board Meeting through this same notice. No mention of the May 24 Special Board Meeting was made in the Rockwell TRO Motion.

134.   Plaintiffs immediately filed their own motion for a temporary restraining order (the "Plaintiffs TRO Motion"). Plaintiffs also, through counsel, asked counsel for Rockwell to delay the Board meeting by approximately fifteen hours, as the matters Defendants intended to consider that evening were at the very core of the court hearing scheduled for the following morning. Counsel for Rockwell refused to consider a delay, and Defendants carried on with their lawless Board meeting.

135.   The May 24 Special Board Meeting proceeded in much the same manner as the May 22 Special Board Meeting. The call lasted less than two minutes in total. Neither Bagley nor Boyd was permitted to speak. All resolutions were approved by the Board on a vote of five to two, despite the clear necessity under the Bylaws and applicable law for the five Defendants to recuse themselves from every matter addressed. Immediately after the resolutions were purportedly approved, Defendants and their counsel disconnected from the call without adjourning the meeting. Chioini, Boyd, and Bagley remained on the call, continued the still un-adjourned meeting, and voted to overturn each of the motions purportedly passed on the strength of the five conflicted Defendants' votes.

136.   Despite the pendency of Plaintiffs' TRO Motion, as part of the Resolution purportedly passed by the Board, the Board impermissibly attempted to delegate all of its responsibilities and duties to a Special Committee of the Board that comprised less than the full Board. Defendants created the "Special Committee" in order to hijack the Company and usurp all of the rights and obligations of the Board. Acting through the "Special Committee" in secret and in derogation of the Company's bylaws and Michigan law, the Defendants were able to effectively purport to act as a super-board and exclude all Board members from information and decisions purportedly undertaken by the Company. Among other acts that the Board delegated to the "Special Committee" "the full power to and

authority to exercise all rights, powers and privileges of the Board, to the fullest extent such delegation is permitted under applicable law". This included rights and duties specifically reserved to the Board by the bylaws, including the right to appoint officers, call for meetings of the shareholders, reconstitute the Board, and amend the bylaws.

137. Immediately following the May 24 Special Board Meeting, the five Defendants issued a Press Release (the "May 24 Press Release"). The May 24 Press Release contained the following materially false and misleading statements:

a. First, the May 24 Press Release stated that Special Transition Committee was comprised of three independent directors, Wolin, Colleran, and Cooper. This statement failed to note the significant conflicts of Wolin, Colleran, and Cooper in the matter they were appointed to oversee. It also failed to note that the committee was formed without adherence to the proper governance processes.

b. Second, the May 24 Press Release stated that Chioini was terminated from his position as CEO only after "a thorough review of the business, including an evaluation of management, which was conducted by the newly augmented Board beginning in March 2018." No such review or evaluation was performed, and if it was, it was performed without notice to or the approval or participation of Boyd

and Bagley. The firing, carried out abruptly, with was furthermore not in the best interest of the shareholders or the Company.

c.  Third, the May 24 Press Release falsely stated that Chioini was deemed to have resigned his directorship pursuant to his Employment Agreement. This statement failed to note that neither Bagley nor Boyd concurred with this statement. It was also false, as the vote of the shareholders required by the Bylaws and Michigan law to remove a Director from the Board never occurred.

d.  Fourth, the May 24 Press Release stated that Chioini had acted without authorization in the days since his purported termination, including the filing of the Chioini May 23 8-K. However, Chioini was authorized to file the 8-K both by virtue of his continued position as CEO of Rockwell, and by virtue of Boyd's and Bagley's approval.

e.  Fifth, the May 24 Press Release falsely stated that the assertions contained in the Chioini May 23 8-K were unrelated to the purported termination of Chioini.

f.  Sixth, the May 24 Press Release stated that "due to the conduct of Mr. Klema in connection with and following the termination of Mr. Chioini, including causing the filing of the unauthorized 8-K, five independent directors of the Board have unanimously agreed on the

need to remove Mr. Klema from his roles at the Company as well." This statement fails to note that three directors—Chioini, Bagley, and Boyd—were not given notice of the supposed meeting at which the vote took place, and would have voted against the resolution to terminate Klema if given the opportunity. It further misrepresents the nature of the Chioini May 23 8-K. Finally, Defendants decided to terminate Klema in retaliation for filing the Whistleblower Complaint before the May 22 Special Board Meeting, implying that the Chioini May 23 8-K could not have played any part in the determination to purportedly terminate him. Further, the reference to five independent directors "unanimously" agreeing misleads the public that this was somehow a unanimous decision—two of the independent directors did not agree to any such action, and the two who disagree are the only non-conflicted Directors entitled to vote; the statement more accurately would read that the only two Directors not implicated in the wrongdoing unanimously agree that Chioini and Klema should remain as the respective CEO and CFO of Rockwell and any such purported termination of them is ineffective.

g. Seventh, the May 24 Press Release stated that a suit had been filed by Rockwell in Oakland County Circuit Court. This statement fails to

mention the exclusion of Bagley and Boyd from the determination to bring this lawsuit.

h. Eighth, the May 24 Press Release stated that Rockwell was "fully cooperating with Nasdaq" in an inquiry about the two Form 8-Ks filed on May 23, 2018. However, Defendants have consistently excluded Bagley, Boyd, and Chioini from correspondence with Nasdaq.

### 5. *The Events of Friday, May 25, 2018.*

138.   On May 25, 2018, the Oakland County Circuit Court (the "Circuit Court") heard both TRO Motions. The Court did not rule on the motion, instead requesting that the parties thereto enter into a stipulated order (the "Stipulated Order") and enter into twenty-one days of facilitation. The Circuit Court made it clear from the bench that neither party had won their motion, and that no representations should be made indicating otherwise.

139.   The Stipulated Order, *inter alia*, directed that Bagley and Boyd be included in all Board Meetings and that Rockwell take no material actions with regard to the matter without leave of court. The Circuit Court did not specifically include in the Stipulated Order, but strongly indicated to the Parties, that the Board as whole should be overseeing the day-to-day functions of Rockwell, and that the Dickinson Wright investigation should continue unimpeded by Defendants. The

Court also made it clear that no negative press releases or other negative public comment should be made.

140. Defendants have repeatedly acted in a manner which is entirely inconsistent with the Stipulated Order. This includes, but is not limited to, promotion of an individual into the newly created role of Chief Accountant Officer; inferring to employees and others that the Circuit Court granted the Rockwell TRO Motion; assumed control over communication with outside parties by taking over responsibility for investor and customer relations; making plans to move Rockwell out of Michigan based on their derogatory belief that no talented people live in the state or would want to live in the state; attempting to delete the May 24 Press Release issued by Chioini and the biographies of Chioini and Klema off the website; calling a May 30 Board Meeting to discuss and potentially take action on the Demand Letter and the SEC matter, as well as to appoint Costello corporate secretary; impeding the Dickinson Wright investigation and refusing to reimburse Dickinson Wright for their work; refusing to allow Bagley and Boyd to participate in the running of the company, including by precluding them from receiving or otherwise failing to provide them with relevant information concerning Rockwell's operations, advising employees not to communicate with or otherwise provide Boyd and Bagley with information, and holding further secret

meetings without notice to Boyd or Bagley; and refusing to give Bagley and Boyd access to evidence.

141.  Defendants have also, in clear contradiction of the Court's order that the Board "shall not make any **material** decisions regarding this matter without leave of the Court," attempted to substantially alter the company's long-established strategy with respect to the commercialization of Triferic, excluding Bagley and Boyd from the decision and discussion. If allowed to take this action, it would cause irreparable harm to Rockwell.

142.  Indeed, on June 13, 2018, the Court ordered, over objections of counsel purportedly representing the Company, that the shareholder meeting previously scheduled to occur June 21, 2018 shall be adjourned.

## FIRST CAUSE OF ACTION

### Violation of 15 U.S.C. § 78u-6(h)
### Against All Defendants

143.  Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

144.  By means of the Whistleblower Complaint, filed on May 17, 2018 by Plaintiffs, through Counsel, in accordance with 15 U.S.C. § 78u-6, voluntarily provided the SEC with information, derived from their own independent knowledge and independent analysis, regarding possible securities violations. Such possible securities violations included, but are not necessarily limited to:

59

a. Cooper, for violations of Regulation FD, as well as violating, and causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Cooper engaging in undisclosed and unauthorized discussions with Richmond to reach a side agreement during the negotiation of the First Settlement Agreement;

b. Cooper, for uncured violations of Regulation FD arising out of Cooper's disclosure to Richmond of material information regarding a potential challenge and litigation to Rockwell's intellectual property, which violation may have led to insider trading or market manipulation;

c. Ravich, for uncured violations of Regulation FD arising out of conversations with Richmond, which were not disclosed to the Board, management, or the shareholders, in which Ravich disclosed MNPI regarding (i) potential significant changes in management compensation; (ii) internal discussions on the sale of Rockwell's concentrate business; (iii) future financing; and (iv) the sale, pricing, and other information concerning Triferic;

d. Ravich, for uncured violations of Regulation FD, and/or causing the Company to violate federal anti-fraud securities laws, including

60

Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Ravich's sharing of MNPI with Richmond on at least three occasions, including inside information, which information included, but was not limited to, potential Board proposals on Chioini's compensation

e.  Ravich and/or Cooper, upon information and belief, for uncured violations of Regulation FD arising out of the disclosure of MNPI to Richmond regarding supposedly forthcoming "bad news" on the Company's Calcitriol drug manufacturing submission, which information Richmond disclosed to other shareholders;

f.  Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to her appointment to the Board, that she was implicated as a part of a SEC stock manipulation investigation as CEO of NeoStem, that, upon information and belief, was the impetus for her resignation;

g.  Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by falsifying, or causing to be falsified, compensation reports which were used to compute director

61

compensation in order to significantly increase her own compensation and decrease that of management, which actions may have constituted self-dealing;

h. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose her existing relationship with Emery and using that relationship to manipulate the selection of an Additional Director who would collaborate with Smith scheme to enrich herself, the other Defendants, and Richmond at Rockwell's expense;

i. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in a related party transaction in which Smith referred a vendor to the company without disclosing that, if the vendor was selected, it would have paid Smith a referral fee, an action which may constitute self-dealing, and which may result in the Company being required to issue restatements of financial statements;

j. Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the

Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was implicated as a part of a shareholder lawsuit for giving materially misleading information to shareholders while CFO and CEO of Discovery Labs;

k. Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was accused of, *inter alia*, personally selling his stock in Discovery Labs while shareholders were unaware of certain material issues with manufacturing;

l. Smith, Cooper, and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in undisclosed and unauthorized separate discussions with Richmond, during the negotiations of the Second Settlement Agreement, in order to ensure that the final settlement benefited them;

m. Cooper and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by communicating confidential Company information which belonged to Rockwell, during the negotiations of the First Settlement Agreement, Second Settlement Agreement, and the Amendment to the Second Settlement Agreement, in order to ensure that the final Settlements benefited them;

n. Wolin, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose and actively hiding from the Company his prior relationship with Emery and Ignite, when had such relationship been known, Wolin would not have been elected to the Board; and

o. Colleran, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose the extent of her prior relationship with Wolin, when had such relationship been known, Colleran would not have been elected to the Board.

145. As of the time that they filed the Whistleblower Complaint, Plaintiffs had not been requested to participate in, and they did not make the Whistleblower Complaint as a result of any request to participate in, any investigation by the SEC or any other public body.

146. Plaintiffs reasonably believed that the information they provided related to possible securities law violations which had already occurred, were ongoing, and/or were about to occur.

147. Plaintiffs made their Whistleblowing Complaint in the manner prescribed by 15 U.S.C. §78u-6(h) and the rules and regulations promulgated thereunder. Specifically Plaintiffs, through counsel, submitted the Whistleblowing Complaint through the SEC's Web site located at www.sec.gov in accordance with 17 CFR §240.21F-9(a)(1).

148. At the time they made their Whistleblowing Complaint, Plaintiffs declared under penalty of perjury that the information they submitted was true and correct to the best of their knowledge and belief in accordance with 17 CFR §240.21F-9(b).

149. Defendants were made aware of the Whistleblowing Complaint on May 21, 2018 through an email sent by Klema.

150. Chioini was terminated by Defendants less than twenty-five hours after Defendants were informed of the Whistleblower Complaint made against Ravich, Smith, and Cooper, and implicating Wolin and Colleran.

151. Upon information and belief, after Klema informed Defendants of the existence of the Whistleblower Complaint in an email sent the evening of May 21, 2018, and before the May 22, 2018 Special Board Meeting at which Defendants purported to terminate Chioini, Defendants held a secret, unauthorized meeting. Upon information and belief, at that meeting or in its aftermath, Defendants determined to terminate Chioini at the May 22, 2018 Special Board Meeting and Klema at some point soon thereafter.

152. Defendants' actions at the May 22 Special Board Meeting were undertaken in such a manner as could only have been executed through prior coordination. Such coordination included, but was not limited to, immediately recognizing Wolin's motion to terminate Chioini's employment, despite it being made outside of proper corporate governance procedures; ignoring the objections of Plaintiffs, Boyd, and Bagley to the manner in which Wolin made the motion; and leaving the conference call almost simultaneously after only six of the seven independent Directors had voted on the matter.

153. In order to disguise their true motives, Defendants made false claims regarding the grounds for terminating Chioini's employment. Among those false

claims was that a "thorough review of the Company's business, including an evaluation of management" had taken place after Wolin and Colleran became Directors; however, upon information and belief, no such review or evaluation took place, and to the extent such reviews or evaluations did take place, it took place without notice to or participation from the Board's two non-conflicted directors, Boyd and Bagley. Furthermore, neither Chioini nor Klema were given any indication that the Board was considering their termination.

154.   In order to disguise their true motives, Defendants also made false claims regarding the grounds for terminating Klema's employment. Among those false claims was that a ground for his termination was his participation in the filing of the Chioini May 22 8-K. However, both Klema and Chioini were given permission by Boyd and Bagley, the two non-conflicted Directors entitled to vote on the matter, to issue the Chioini May 22 8-K.

155.   The two independent, non-conflicted Directors, Boyd and Bagley, believe, and have so-stated in papers submitted to the Oakland County Circuit Court, that Defendants' actions to terminate Chioini and Klema was done in retaliation for filing the Whistleblower Complaint.

156.   Plaintiffs each suffered an unfavorable employment action when their employment was terminated.

157. Plaintiffs' Whistleblower Complaint was a contributing factor to Plaintiffs employment being terminated.

158. Defendants would not have taken the same personnel action in the absence of Plaintiffs filing the Whistleblower Complaint.

159. As a direct and proximate of their unlawful terminations, Plaintiffs have experienced and will continue to experience economic losses in the form of lost wages and benefits.

160. As a direct and proximate cause of their unlawful terminations, Plaintiffs have experienced and will continue to experience non-economic losses in the form of loss of reputation, embarrassment, humiliation, emotional distress, mental anguish, and outrage.

161. Plaintiffs are therefore entitled to reinstatement to their positions as Chief Executive Officer and Chief Financial Officer of Rockwell, two-times the amount of back pay otherwise owed to Plaintiffs, with pre- and post-judgment interest, costs, reasonable attorneys' fees, expert witness fees, and any such further relief as this Court deems appropriate.

## SECOND CAUSE OF ACTION

### Violation of Michigan Whistleblowers' Protection Act
### Against All Defendants

162. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

68

163.   By means of the Whistleblower Complaint, filed on May 17, 2018 by Plaintiffs through Counsel, Plaintiffs voluntarily provided the SEC with information, derived from their own independent knowledge and independent analysis, regarding possible securities violations in the manner prescribed by law. Such possible securities violations included, but are not necessarily limited to:

    a.  Cooper, for violations of Regulation FD, as well as violating, and causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Cooper engaging in undisclosed and unauthorized discussions with Richmond to reach a side agreement during the negotiation of the First Settlement Agreement;

    b.  Cooper, for uncured violations of Regulation FD arising out of Cooper's disclosure to Richmond of material information regarding a potential challenge and litigation to Rockwell's intellectual property, which violation may have led to insider trading or market manipulation;

    c.  Ravich, for uncured violations of Regulation FD arising out of conversations with Richmond, which were not disclosed to the Board, management, or the shareholders, in which Ravich disclosed MNPI regarding (i) potential significant changes in management

69

compensation; (ii) internal discussions on the sale of Rockwell's concentrate business; (iii) future financing; and (iv) the sale, pricing, and other information concerning Triferic;

d. Ravich, for uncured violations of Regulation FD, and/or causing the Company to violate federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Ravich's sharing of MNPI with Richmond on at least three occasions, including inside information, which information included, but was not limited to, potential Board proposals on Chioini's compensation

e. Ravich and/or Cooper, upon information and belief, for uncured violations of Regulation FD arising out of the disclosure of MNPI to Richmond regarding supposedly forthcoming "bad news" on the Company's Calcitriol drug manufacturing submission, which information Richmond disclosed to other shareholders;

f. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to her appointment to the Board, that she was implicated as a part of a SEC stock manipulation investigation as

CEO of NeoStem, that, upon information and belief, was the impetus for her resignation;

g. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by falsifying, or causing to be falsified, compensation reports which were used to compute director compensation in order to significantly increase her own compensation and decrease that of management, which actions may have constituted self-dealing;

h. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose her existing relationship with Emery and using that relationship to manipulate the selection of an Additional Director who would collaborate with Smith scheme to enrich herself, the other Defendants, and Richmond at Rockwell's expense;

i. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in a related party transaction in which Smith referred a vendor to the company without

71

disclosing that, if the vendor was selected, it would have paid Smith a referral fee, an action which may constitute self-dealing, and which may result in the Company being required to issue restatements of financial statements;

j. Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was implicated as a part of a shareholder lawsuit for giving materially misleading information to shareholders while CFO and CEO of Discovery Labs;

k. Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was accused of, *inter alia*, personally selling his stock in Discovery Labs while shareholders were unaware of certain material issues with manufacturing;

l. Smith, Cooper, and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-

fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in undisclosed and unauthorized separate discussions with Richmond, during the negotiations of the Second Settlement Agreement, in order to ensure that the final settlement benefited them;

m. Cooper and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by communicating confidential Company information which belonged to Rockwell, during the negotiations of the First Settlement Agreement, Second Settlement Agreement, and the Amendment to the Second Settlement Agreement, in order to ensure that the final Settlements benefited them;

n. Wolin, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose and actively hiding from the Company his prior relationship with Emery and Ignite, when had such relationship been known, Wolin would not have been elected to the Board; and

73

o. Colleran, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose the extent of her prior relationship with Wolin, when had such relationship been known, Colleran would not have been elected to the Board.

164.   Plaintiffs reasonably believed that the information they provided related to possible securities law violations which had already occurred, were ongoing, and/or were about to occur.

165.   Defendants were made aware of the Whistleblowing Complaint on May 21, 2018 through an email sent by Klema.

166.   Chioini was terminated by Defendants less than twenty-five hours after Defendants were informed of the Whistleblower Complaint made against Ravich, Smith, and Cooper, and implicating Wolin and Colleran.

167.   Upon information and belief, after Klema informed Defendants of the existence of the Whistleblower Complaint in an email sent the evening of May 21, 2018, and before the May 22, 2018 Special Board Meeting at which Defendants purported to terminate Chioini, Defendants held a secret, unauthorized meeting. Upon information and belief, at that meeting or in its aftermath, Defendants determined to terminate Chioini at the Special Board Meeting and Klema at some point thereafter.

168.   Defendants' actions at the Special Board Meeting were undertaken in such a manner as could only have been executed through prior coordination. Such coordination included, but was not limited to, immediately recognizing Wolin's motion to terminate Chioini's employment, despite it being made outside of proper corporate governance procedures; ignoring the objections of Plaintiffs, Boyd, and Bagley to the manner in which Wolin made the motion; and leaving the conference call almost simultaneously after only six of seven independent Directors had voted on the matter.

169.   In order to disguise their true motives, Defendants made false claims regarding the grounds for terminating Chioini's employment. Among those false claims was that a "thorough review of the Company's business, including an evaluation of management" had taken place after Wolin and Colleran became Directors; however, upon information and belief, no such review or evaluation took place, and to the extent such reviews or evaluations did take place, it took place without notice to or participation from the Board's two non-conflicted directors, Boyd and Bagley.

170.   In order to disguise their true motives, Defendants also made false claims regarding the grounds for terminating Klema's employment. Among those false claims was that a ground for his termination was his participation in the filing of the Chioini May 22 8-K. However, both Klema and Chioini were given

permission by Boyd and Bagley, the two non-conflicted Directors entitled to vote on the matter, to issue the Chioini May 22 8-K.

171.   The two independent, non-conflicted Directors, Boyd and Bagley, believe, and have so-stated in papers submitted to the Oakland County Circuit Court, that Defendants' actions to terminate Chioini and Klema was done in retaliation for filing the Whistleblower Complaint.

172.   Plaintiffs each suffered an unfavorable employment action when their employment was terminated.

173.   Plaintiffs' Whistleblower Complaint was a contributing factor to Plaintiffs employment being terminated.

174.   Defendants would not have taken the same personnel action in the absence of Plaintiffs filing the Whistleblower Complaint.

175.   As a direct and proximate of their unlawful terminations, Plaintiffs have experienced and will continue to experience economic losses in the form of lost wages and benefits.

176.   As a direct and proximate cause of their unlawful terminations, Plaintiffs have experienced and will continue to experience non-economic losses in the form of loss of reputation, embarrassment, humiliation, emotional distress, mental anguish, and outrage.

177.   Plaintiffs are therefore entitled to reinstatement to their positions as Chief Executive Officer and Chief Financial Officer of Rockwell, back wages, full reinstatement of fringe benefits and seniority rights, actual damages, with pre- and post-judgment interest, costs, reasonable attorneys' fees, expert witness fees, and any such further relief as this Court deems appropriate.

## THIRD CAUSE OF ACTION

### Discharge in Violation of Michigan Public Policy
### Against All Defendants

178.   Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

179.   Michigan public policy created a duty upon Defendants to refrain from retaliatory adverse employment action against employees who refuse to violate federal laws or regulations while carrying out their job duties.

180.   Defendants had a duty to Plaintiffs to refrain from terminating them because they refused to violate federal laws or regulations, including, but not limited to Sections 10(b) and 13 of the Securities of the Securities and Exchange Act of 1934 and the rules promulgated thereunder, including Section 10(b) of the Exchange Act, SEC Rule 10b-5, and Regulation FD.

181.    Violations of federal law which Defendants intended for Plaintiffs to ignore or participate in, and which Plaintiffs instead disclosed to the SEC, included, but are not necessarily limited to:

a.    Cooper, for violations of Regulation FD, as well as violating, and causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Cooper engaging in undisclosed and unauthorized discussions with Richmond to reach a side agreement during the negotiation of the First Settlement Agreement;

b.    Cooper, for uncured violations of Regulation FD arising out of Cooper's disclosure to Richmond of material information regarding a potential challenge and litigation to Rockwell's intellectual property, which violation may have led to insider trading or market manipulation;

c.    Ravich, for uncured violations of Regulation FD arising out of conversations with Richmond, which were not disclosed to the Board, management, or the shareholders, in which Ravich disclosed MNPI regarding (i) potential significant changes in management compensation; (ii) internal discussions on the sale of Rockwell's

concentrate business; (iii) future financing; and (iv) the sale, pricing, and other information concerning Triferic;

d.  Ravich, for uncured violations of Regulation FD, and/or causing the Company to violate federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, arising out of Ravich's sharing of MNPI with Richmond on at least three occasions, including inside information, which information included, but was not limited to, potential Board proposals on Chioini's compensation

e.  Ravich and/or Cooper, upon information and belief, for uncured violations of Regulation FD arising out of the disclosure of MNPI to Richmond regarding supposedly forthcoming "bad news" on the Company's Calcitriol drug manufacturing submission, which information Richmond disclosed to other shareholders;

f.  Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to her appointment to the Board, that she was implicated as a part of a SEC stock manipulation investigation as CEO of NeoStem, that, upon information and belief, was the impetus for her resignation;

79

g. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by falsifying, or causing to be falsified, compensation reports which were used to compute director compensation in order to significantly increase her own compensation and decrease that of management, which actions may have constituted self-dealing;

h. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose her existing relationship with Emery and using that relationship to manipulate the selection of an Additional Director who would collaborate with Smith scheme to enrich herself, the other Defendants, and Richmond at Rockwell's expense;

i. Smith, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in a related party transaction in which Smith referred a vendor to the company without disclosing that, if the vendor was selected, it would have paid Smith a referral fee, an action which may constitute self-dealing, and which

may result in the Company being required to issue restatements of financial statements;

j.  Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was implicated as a part of a shareholder lawsuit for giving materially misleading information to shareholders while CFO and CEO of Discovery Labs;

k.  Cooper, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose to the Company prior to his appointment to the Board, that he was accused of, *inter alia*, personally selling his stock in Discovery Labs while shareholders were unaware of certain material issues with manufacturing;

l.  Smith, Cooper, and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by engaging in undisclosed and unauthorized

separate discussions with Richmond, during the negotiations of the Second Settlement Agreement, in order to ensure that the final settlement benefited them;

m. Cooper and Ravich, for, upon information and belief, violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by communicating confidential Company information which belonged to Rockwell, during the negotiations of the First Settlement Agreement, Second Settlement Agreement, and the Amendment to the Second Settlement Agreement, in order to ensure that the final Settlements benefited them;

n. Wolin, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose and actively hiding from the Company his prior relationship with Emery and Ignite, when had such relationship been known, Wolin would not have been elected to the Board; and

o. Colleran, for violating, as well as causing the Company to violate, federal anti-fraud securities laws, including Section 10(b) of the Exchange Act and SEC Rule 10b-5, by failing to disclose the extent of

her prior relationship with Wolin, when had such relationship been known, Colleran would not have been elected to the Board.

182. In violation of this duty, Defendants terminated Plaintiffs because Plaintiffs refused to themselves commit, and did in fact report, the aforementioned violations of federal law, and refused to aid and abet Defendants' scheme to enrich themselves to the determinant of Rockwell and its shareholders and reported Defendants' malfeasance to the SEC.

183. In order to disguise their true motives, Defendants made false claims regarding the grounds for terminating Chioini's employment. Among those false claims was that a "thorough review of the Company's business, including an evaluation of management" had taken place after Wolin and Colleran became Directors; however, upon information and belief, no such review or evaluation took place, and to the extent such reviews or evaluations did take place, it took place without notice to or participation from the Board's two non-conflicted directors, Boyd and Bagley.

184. In order to disguise their true motives, Defendants also made false claims regarding the grounds for terminating Klema's employment. Among those false claims was that a ground for his termination was his participation in the filing of the Chioini May 22 8-K. However, both Klema and Chioini were given

83

permission by Boyd and Bagley, the two non-conflicted Directors entitled to vote on the matter, to issue the Chioini May 22 8-K.

185.    In reality, the Board determined to terminate Klema before the Chioini May 22 8-K was issued in retaliation for filing the Whistleblower Complaint.

186.    As a direct and proximate of their unlawful terminations, Plaintiffs have experienced and will continue to experience economic losses in the form of lost wages and benefits.

187.    As a direct and proximate cause of their unlawful terminations, Plaintiffs have experienced and will continue to experience non-economic losses in the form of loss of reputation, embarrassment, humiliation, emotional distress, mental anguish, and outrage.

188.    Plaintiffs are therefore entitled to damages, costs, pre- and post-judgment interest, reasonable attorneys' fees, and any such further relief as this Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.    Issue a mandatory injunction reinstating Chioini to his position as Chief Executive officer;

B.      Issue a mandatory injunction reinstating Klema to his position as Chief Financial Officer;

C.      Order Defendants to pay costs, losses, and damages including the amount of Plaintiffs' back wages, doubled, restitution, all other actual damages suffered by Plaintiffs, punitive damages, costs, pre- and post-judgment interest, reasonable attorney's fees, and expert witness fees; and

D.      Grant any such further relief as this Court deems appropriate.


## JURY DEMAND

Plaintiffs demand trial by jury.


DATED: June 13, 2018                    **THE MILLER LAW FIRM, P.C.**

                                        */s/ E. Powell Miller*
                                        E. POWELL MILLER (P39487)
                                        MARC L. NEWMAN (P51393)
                                        950 West University Drive, Suite 300
                                        Rochester, MI 48307
                                        Telephone: 248/841-2200
                                        248/652-2852 (fax)
                                        epm@millerlawpc.com
                                        mln@millerlawpc.com